# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **Dayle W. Maas,** | **NO. 02-CV-3671 (DWF/SRN)** |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **Joanne D. Barnhart** **Commissioner of Social Security,** | |
| **Defendant.** | |

---

William A. Celebrezze, on behalf of Plaintiff

Lonnie F. Bryan, Esq., on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security (Commissioner), who found Plaintiff not statutorily disabled and not entitled to Disability Insurance Benefits (DIB) under 42 U.S.C. §§ 416(I) and 423(d).

The parties have submitted cross motions for summary judgment. (Pl.'s Mot. for Summ. J. at Doc. No. 32; Def.'s Mot. for Summ. J. at Doc. No. 41.). The matter has been referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c).

## I.    BACKGROUND

### A.    Procedural History

Plaintiff filed an Application for Disability Insurance Benefits on August 20, 1998, alleging disability

as of October 11, 1977, due to chronic low back and leg pain. (Tr. at 96-98.) This Application was denied on May 14, 1999. (Tr. at 70-73.) Plaintiff then filed a Request for Reconsideration on August 11, 1999 (Tr. at 105), which was denied on January 8, 2001 (Tr. at 82-85.) Thereafter, Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ") on March 5, 2001 (Tr. at 86-87), and a hearing was held on September 18, 2001 before ALJ Michael Quayle. (Tr. at 351.) The ALJ denied Plaintiff's claim on January 23, 2002 (Tr. at 351-63), and Plaintiff filed a Request for Review with the Appeals Council, which ultimately affirmed the ALJ's decision. (Tr. at 364-65.)

Plaintiff filed his Complaint on September 19, 2002. (Doc. No. 1.) Pursuant to a January 2003 Order of this Court (Doc. No. 10), the case was remanded for further action by the Commissioner of Social Security based upon the fact that the hearing tapes from the September 18, 2001 hearing were largely inaudible. Plaintiff participated in a de novo administrative hearing before ALJ Paul D. Tierney on July 8, 2003. At the hearing, Plaintiff, represented by counsel, a medical expert, and a vocational expert testified. ALJ Tierney denied Plaintiff's claim in a written decision dated November 20, 2003 (Tr. 14-26.) The Appeals Council denied Plaintiff's Request for Review and Defendant moved to reopen the case to allow it to proceed to judgment. (Doc. No. 15.) By Order of June 17, 2004, the case was reopened. (Doc. No. 22.)

Plaintiff challenges the ALJ's conclusions based on the following arguments: (1) Plaintiff's back impairment meets or equals Listing 1.04 of the Listing of Impairments; (2) the Commissioner erred in disregarding the opinion of Plaintiff's treating physician that Plaintiff is disabled; (3) the Commissioner's RFC is unsupported by substantial evidence, resulting in a flawed hypothetical question to the vocational expert; and (4) because the vocational expert's testimony has no basis in relevant foundational facts, the Commissioner failed to meet her step five burden of establishing the existence of significant numbers of

2

other jobs that Plaintiff could perform.

Defendant disagrees with Plaintiff's contentions, arguing that because the ALJ's findings are supported by substantial evidence in the record, summary judgment should be granted for Defendant.

**B.      Factual Background**

Plaintiff was born in 1951 and was twenty-six years old at the time he became disabled in 1977, and was thirty years old on December 31, 1981, the date his insured status expired. (Tr. 96, 102.) Thus, during the relevant period of disability, he was considered a "younger person," as defined by the regulations. (See 20 C.F.R. § 404.1563; Tr. 24.) Plaintiff possesses a GED and past relevant work as a paver operator (heavy, skilled work as he performed it, medium work as defined by the United States Department of Labor's Dictionary of Occupational Titles ("DOT") (4th ed. 1991), tank repairer (heavy, skilled work), electrical assembler (heavy, semiskilled as he performed it, light work as defined by the DOT); and construction laborer (heavy, unskilled work).[1]  (Tr. at 44, 107, 194, 397.)

Plaintiff alleges that he became disabled in October 1977 while working as a construction paver. (Tr. at 45.)  While lifting some extensions to the machinery, a coworker slipped and the full weight of the equipment fell on Plaintiff, causing injury to the lumbar spine. Id.  As a result, Plaintiff received treatment for chronic low back pain and leg pain. (Tr. at 15.)   For a review of Plaintiff's personal, medical and earnings information, see the ALJ's decision dated November 20, 2003 (Tr. At 14-26); the transcript of the July 8, 2003 hearing (Tr. at 31-69); and the hearing exhibits (Tr. at 70-438).

**C.      Hearing Testimony**

**1.      Testimony of Plaintiff**

---

[1]He received his GED when he was in the military, which was between 1971-73.  (Tr. at 41.)

At the July 8, 2004 hearing, Plaintiff testified he held no gainful employment since his 1977 injury and has had four surgeries on his back, the most recent occurring in 1983. (Tr. at 36.) Plaintiff testified that from the date of his discharge from the military in 1973, until his 1977 injury, he worked for one company doing road crew black-topping. (Tr. at 44.) In this capacity, he operated and maintained a blacktop paver, rollers, front-end loaders and trucks. He stated that he performed this type of manual labor on a daily basis. (Tr. at 44.) He testified that as of the date of last insured status, December 31, 1981, his condition was basically the same as it was at the time of his injury, though it has worsened over time since then.

Following his 1977 injury while working as a construction paver, his primary treating doctor was Dr. Paul Gislason. (Tr. at 45.) Plaintiff testified that at no point between the date of his injury and December 1981, did Dr. Gislason release him to return to work. (Tr. at 45.) Instead, his doctor recommended that following his first back surgery, he should not return to his former job, but should enter a different line of work. (Tr. at 38; 50.)

At some point in approximately 1979, Plaintiff therefore enrolled in a vocational school, where he had completed about one-third of the course in machinist tool and dye training, when his back injury flared up again. (Tr. at 38-39.) He went to see Dr. Gislason and had back surgery, but testified that he could not continue his schooling. (Tr. at 39.) In Plaintiff's words, "I just could not function anymore after that second back surgery." (Tr. at 48.) Plaintiff stated that through rehabilitation, he was on a job search for approximately two months, but was unable to find employment due to his physical limitations. (Tr. at 42; 52.) He discontinued the job search due to more back surgery. (Tr. at 52.) Plaintiff performed some

work from 1996-2000 for his local fire department, on a volunteer basis. [2] (Tr. at 55.)  His work there

consisted of ensuring that the trucks received maintenance, though he did not perform the maintenance

work himself.  (Tr. at 55-56.)

      During the 1977-1981 time period, Plaintiff stated that his ability to stand and walk for any length

of time was dependent on the type of day that he was having.  (Tr. at 39.)  He testified that he found it

necessary to alternate sitting and standing with lying down and that, on some days, he found it necessary

to crawl in order to go to bed or to the restroom.  At the time, his oldest son was six years old, and Plaintiff

found it difficult to engage in many activities with him, such as sports.  (Tr. at 40.)      As to activities of

daily living, Plaintiff drives a motor vehicle approximately twelve miles every day and performs

approximately two-three hours of daily household chores such as dishes, laundry, and driving a riding lawn

mower.  (Tr. at 40-41; 48.)  He watches television, does some yard work, plays cards and is involved in

a local legion group.  Because his wife does not drive, he also drives his wife to work and to other activities.

(Tr. at 41.)  He described himself as a "Mr. Mom kind of a guy."  (Tr. at 41.)  He is unable to go to movies

because he cannot sit for any length of time, but he and his wife regularly go out to eat on weekends.  (Tr.

at 42.)  He testified that he is able to take care of most all of his personal needs, with the exception of lacing

his shoes or trimming his toenails, because of his back injury.  (Tr. at 42.)      Prior to his 1977 injury, he

was very involved in recreational activities such as snowmobiling, working as a bartender for the American

Legion during the construction off-season, ice fishing and hunting.  (Tr. at 40.)  Of those activities, he still

participates in ice fishing and deer hunting, the latter because he can walk from the road to a deer stand and

leave whenever he finds it necessary.

---

     [2]The record indicates that Plaintiff received modest remuneration for his services with the fire
department, in the amount of $600-1400 per year, during the 1996-2000 period.

In terms of his physical abilities, Plaintiff testified that he could lift twenty pounds, but not on a day-in, day-out basis, because the next day he would be in bed because of back pain. (Tr. at 47.) He stated that he could do a simple job that did not require him to lift over twenty pounds, with a stand or sit option, if he could also lie down. (Tr. at 42-43.) Plaintiff presently spends approximately two hours a day lying down, primarily because of headaches, which he has experienced in the last three-four years. He testified that he did not have a headache problem during the 1977-1981 time period. (Tr. at 43.)

Plaintiff also testified that during 1977-1981, he did not see a mental health provider for treatment. (Tr. at 50.) He stated that he was prescribed Valium at different periods of time for depression, but has not been treated by a psychiatrist or psychologist. (Tr. at 50.)

### 2.      Testimony of Medical Expert

Mary Louise Stevens, Ph.D., a neutral medical expert and clinical psychologist, offered very brief testimony. (Tr. at 52-53; CV at Tr. 383.) Essentially, she testified that for the period in question, Plaintiff's main medical complaint was strictly physical – namely, pain. She stated that given his physical condition, it would be understandable to have some depression secondary to the physical problems, but testified that "there's really not enough for me to give an analysis on – based on just the depression." (Tr. at 54.)

Dr. Stevens' short testimony did not contain an opinion on whether Plaintiff's other injuries met or equaled a Social Security medical listing. Nor did she provide any indication of what workplace limitations might have been placed upon Plaintiff in light of his physical limitations. This is perhaps not surprising, given that Dr. Stevens is a clinical psychologist, however, no other expert medical testimony was offered.

### 3.      Testimony of Vocational Expert

ALJ Tierney first asked VE Juletta Harren if, given Plaintiff's impairment, he could return to his past relevant work, assuming it was limited to light work. (Tr. at 56.) VE Harren testified that he could return

to his job as an electrical assembler "as performed in the DOT, but not as he performed it." (Tr. at 56.)

ALJ Tierney posed the following hypothetical fact pattern to VE Harren:

I'd like to you to assume that he's limited to lifting 20 pounds occasionally during the period of time we're talking about, 1977 through 1981, 10 pounds frequently. He'd have to have a sit/stand option whereby he could stand or sit as needed to during the course of the workday. He could occasionally twist or bend or stoop. With those limitations and considering his age during that period of time, that would be in the late – his age would be the late 20's, and his education, he got a GED. First of all, would he be able to do that past relevant work as an electrical assembler?

(Tr. at 56-57.)   VE Harren testified that Plaintiff would not be able to perform his past relevant work as an electrical assembler because she did not believe that such a job, at the semiskilled level, allowed for a sit/stand option. (Tr. at 57.) When asked whether there would have been other jobs in the regional or national economy that Plaintiff could perform, considering Plaintiff's age at the time, his education, past work experience, VE Harren answered affirmatively:

Yes. There would be other work for this individual. And in rehabilitation with an individual who needs a sit/stand option and is a younger worker typically the two jobs that offer the most chance to change position are the security guard and the telemarketer. And currently in the State of Minnesota with a security guard job taking into the – I'm going to eliminate the jobs where there's excessive walking where he wouldn't have that chance to sit or stand. It has to be a security guard job where he's at a location where he has that chance to sit or stand.

(Tr. at 57.) VE Harren went on to state that there are 13,570 such jobs in the State of Minnesota, of which approximately 5,000 have the option to sit or stand. The other job that VE Harren stated is most often suggested in rehabilitation for a person needing a sit/stand option – telemarketing – is one in which there are currently 7,940 workers in the field. In addition, VE Harren testified that the other jobs suitable for persons such as Plaintiff are machine-tending, packaging and assembly-type jobs. She reduced those numbers because of the need for a sit/stand option, and opined that as to machine-tending, there are 5,700 jobs currently in the State of Minnesota – a number she reduced by fifty percent because of the need to

7

have a sit/stand option.  (Tr. at 58.)  As to assembly jobs, she testified that there are over 40,000 jobs in

the State of Minnesota, and breaking them down by categories including sedentary and light, unskilled, she

testified that there are 4,000 such jobs in Minnesota.  Next, as to packagers, in the sedentary and light

category, VE Harren stated that there are a total of 10,000 such jobs; reducing it by half due to the sit/stand

need, results in 5,000 such jobs. (Tr. at 58-59.)

VE Harren further testified that she had "statistics going back to the 80's regarding all these jobs."

(Tr. at 59.)  She stated that she compared the numbers that exist now with the numbers in the 90's and 80's

to arrive at a "few select jobs where the numbers have not changed significantly." (Tr. at 59.)  Specifically,

on examination from Plaintiff's counsel, VE Harren identified her summary job records going back to 1986,

1987 and 1988, statistics from May 1989, and recent numbers from 2002.  (Tr. at 62-63.)  VE Harren

admitted that she did not look at any data before December 31, 1981, reflecting actual numbers of jobs

available in the various job categories about which she testified: "I don't have any information back to

1981.  I thought I was doing a good job coming up with numbers going back to '86." (Tr. at 63.)  Further,

VE Harren stated that if, during the 1977-1981 period, Plaintiff was not released to work by a physician,

then he would not be able to work in any of the jobs about which she testified.  (Tr. at 64.)

### D.    Medical Records

Reviewing the medical records of Plaintiff's treating physicians, the ALJ noted that Plaintiff

sustained a back injury on October 11, 1977, and treated with an orthopedist, Dr. Gislason, on an

emergency basis on October 17, 1977, for his continuing back and leg pain.  (Tr. at 19.)  Physical

examination revealed limited flexion of ten to twenty degrees of the trunk, with pain in the low left back,

weakness of the great toe extensor on the left, some numbness of the L-5 nerve root distribution and

tenderness over the low back.  Extension of the trunk and peripheral pulsations, however, were fairly good.

(Tr. at 19.)

Plaintiff was treated with bed rest, pelvic traction and medications, which did not provide him with any significant pain relief.  Myelography revealed a bulging L4-5 disc on the left side.  On November 30, 1977, Plaintiff underwent an L4-5 and L5-S1 laminectomy with removal of a herniated disc.  Plaintiff reported significant improvement following surgery, though he reported some discomfort at a follow-up appointment on December 21, 1977.  (Tr. at 19.)  At a physical examination on February 1, 1978, Plaintiff reported only occasional backaches and cramping in his left leg, and his physical examination was otherwise normal, with the exception of mildly positive, straight leg raising on the left.  (Tr. at 19.)  Dr. Gislason opined that Plaintiff should not continue working heavy construction and should be rehabilitated.

At his March 20, 1978 appointment, Plaintiff reported feeling quite well, although he noted some cramping in his left leg, but did not report any back pain.  His physical examination was unremarkable, with only mild discomfort on the extremes on straight leg raising.  Dr. Gislason opined that Plaintiff had a fifteen percent disability of his back due to his October 1977 accident and subsequent surgery.  (Tr. at 19.)  At his next appointment, on May 30, 1978, Plaintiff reported pain between the scapulae.  He reported no back pain, however, and indicated that the medication he had been taking for his leg cramping, Quinamm, had been beneficial.

Plaintiff did not see Dr. Gislason again until January 30, 1979, when he sought treatment for cramping in his leg.  Dr. Gislason did not report anything significant with respect to Plaintiff's low back, but adavised him to remain on Quinamm and to take Vitamin B.  (Tr. at 19.)

Plaintiff's physical examination on April 17, 1979 revealed severe muscle spasm and positive straight leg raising at thirty degrees.  (Tr. at 19.)  Later that month, he sought treatment with David A. Neidhart, M.S., with complaints of acute back pain during the preceding two weeks.  Motion of the spine

was quite restricted and straight leg raising was sixty degrees on the right and left with leg pain. Neurological examination was negative and there was no weakness or hypoesthesia. Plaintiff was admitted to the hospital for eleven days of conservative treatment. A mylegram performed during Plaintiff's hospitalization suggested a disc bulge or herniation at the L-4, 5 levels. Dr. Gislason noted, however, that Plaintiff improved to a degree on a conservative program, but that he was advised by hospital staff not to return to work until being seen again by Dr. Gislason. (Tr. at 19-20.)

The following month, in May 1979, Plaintiff sought treatment for low back pain. Dr. Gislason noted tenderness over the L3-4 area and pain with straight leg raising at fifty degrees. In general, Dr. Gislason felt that Plaintiff had improved and recommended that he return in two weeks for another evaluation. (Tr. at 20.)

Plaintiff's examinations in July and September 1979 documented positive straight leg raising bilaterally. A July 1979 EMG of Plaintiff's left leg was normal. (Tr. at 20.)

Approximately six months later, Plaintiff returned to see Dr. Gislason for continuing left lower back and leg pain. Dr. Gislason recommended that Plaintiff undergo further surgery, so on June 4, 1980 Plaintiff underwent a laminectomy, L4-5, L5-S-1 on the left for degenerative disc at L-4, and a prolapsed disc at L5-S1. Circumferential scarring was noted on the nerve root at that level. The disc that was removed was almost a free fragment, and a large disc was removed at the L4-5 area. Plaintiff did well post-operatively. (Tr. at 20.)

At follow-up examinations, Plaintiff reported continuing back pain, revealing a marked limitation of motion on flexion and extension and positive straight leg raising. Treatment notes indicate that Plaintiff continued to complain of back pain in September 1980, October 1980, and December 1980. (Tr. at 20.) Physical examination revealed some tenderness on palpitation over the low back, but Plaintiff was able to

10

extend his legs quite well when sitting.  Dr. Gislason also noted that Plaintiff was able to put on his cowboy

boots without any difficulty.  (Tr. at 20.)

Plaintiff underwent a CAT scan in December 1980, revealing a recurrent herniated disc at L4-5

on the left, chronic calcified bulging at L5-S1 with partial removal of this disc on the left, and post operative

hemilaminectomies at L4-5 and L5-S1, with post operative epidural fibrosis.  Dr. Gislason suggested that

Plaintiff consider undergoing spinal fusion.  (Tr. at 20.)

Plaintiff next underwent a laminectomy at L5-S1 and L4-5 on the left on April 27, 1981, which

revealed swelling and scarring but no disc herniation.  Because the back itself was quite firm, spinal fusion

was not performed.  Plaintiff continued to report difficulty following the surgery, including left leg

discomfort.  In June 1981, a physical examination revealed positive straight leg raising bilaterally and

tenderness to palpitation over his scar.  Dr. Gislason advised Plaintiff to engage in more physical activity

such as swimming.  In the meantime, Dr. Gislason opined that Plaintiff's disability remained and that he was

unable to return to work at this time.  (Tr. at 266.)

In August 1981, Plaintiff saw Dr. Gislason again, who advised readmission to the hospital for

conservative treatment of his low back problem and physical therapy.  (Tr. at 265.)  In September 1981,

Dr. Gislason reported that Plaintiff was hospitalized for ten days, during which time he had a very high uric

acid level, for which he received treatment.  (Tr. at 264.)  Next, Plaintiff saw Dr. Gislason in October 1981,

during which time he continued to take medication for his high uric acid level, but reported little

improvement.  Dr. Gislason noted that Plaintiff was quite uncomfortable on flexion of the trunk, though the

range of motion was quite good.  Straight leg raising was positive on the left at 35 degrees and 50 degrees

on the right.  His ankle jerk was absent on the left compared to being active on the right.  Dr. Gislason

prescribed sleep and pain medication.  (Tr. at 263.)

In December 1981, Plaintiff next treated with Dr. Gislason, who commented upon Plaintiff's continued difficulty with his back.  Dr. Gislason noted that Plaintiff had had no improvement with physical therapy and that Plaintiff reported that his back and leg pain was getting worse.  Plaintiff found it hard to sleep at night because he could not find a comfortable position.  (Tr. at 262.)  Physical examination revealed trunk motion was painful at 45 degrees of flexion.  The ankle jerk was absent on the left with 3+ on the right.  Straight leg raising was positive at 40 degrees bilaterally and Plaintiff could not lie with his leg on the left extended.  (Tr. at 262.)  Dr. Gislason advised Plaintiff to discontinue physical therapy and participate in a swimming program.  Plaintiff, who was not on medication for high uric acid, had a very high uric acid level and Dr. Gislason recommended that he continue with medication.  (Tr. at 262.)  In addition, Dr. Gislason recommended another CAT scan.

On December 30, 1981, Plaintiff again treated with Dr. Gislason.  (Tr. at 261.)  He reported that Plaintiff's recent CAT scan showed a herniated disc at L4-5 on the left.  Dr. Gislason felt that Plaintiff should be treated conservatively and continued to recommend a program of swimming and exercises at the YMCA.  (Tr. at 261.)

Dr. Gislason reiterated this advice at Plaintiff's next appointment in February 1982.[3]  (Tr. at 260.)  Also in February 1982, Plaintiff underwent a neurological examination with Dr. Lawrence Farber.  (Tr. at 21.)  Dr. Farber noted that Plaintiff was in reasonably normal medical condition, except that he described him as obese at 6 feet tall and 220 pounds.  Dr. Farber observed that Plaintiff dragged his left foot slightly when walking, but seemed to limber up as he walked.  Straight leg raising on the left was positive at seventy degrees, and leg raising on the right was carried out to almost ninety degrees, with pain radiating down from

---

[3]The medical record from this point forward post-dates the December 31, 1981 date of Plaintiff's last insured status.

the left low back to the left upper leg.  Plaintiff complained of severe pain down his left leg when attempting

to touch his toes with his feet placed approximately one foot apart.  (Tr. at 21.)  Physical examination

revealed decreased sensation over the sole and dorsum and lateral medial aspects of his left foot, as well

as tenderness in the lower lumbar region.  Dr. Farber observed no particular spasm and Plaintiff was able

to walk on his heels and toes.  Dr. Farber noted that Plaintiff "gave out" somewhat in the hamstrings and

other muscle groups with strength testing.  He opined, however, that this was largely on the basis of

discomfort brought about by Plaintiff's efforts in resisting him.  Dr. Farber found Plaintiff subject to a twenty

percent permanent partial disability of his low back.  He recommended that Plaintiff avoid heavy lifting of

over twenty-five pounds and any job requiring extensive twisting, turning and bending.  However, he

indicated that Plaintiff was able to do "any sort of work which would involve light work, but as long as he

had the freedom to be up and about and moving about at will."  (Tr. at 21.)   Dr. Gislason, Plaintiff's

treating physician, agreed with the findings and conclusions of Dr. Farber.  (Tr. at 256.)

At his next appointment with Dr. Gislason, in May 1982, Plaintiff indicated that he had participated

in a back program at the YMCA, but that it made his condition worse.  He described ever-present left leg

pain and stated that on some mornings he was unable to get out of bed.  (Tr. at 259.)  Dr. Gislason advised

a Williams brace for his back.  At a follow-up visit in July 1982, Plaintiff indicated that he felt worse and

that the Williams brace had not helped him.  (Tr. at 257.)  He reported constant pain down the left leg into

the back, aggravated by sitting.  Dr. Gislason suggested a referral to a pain clinic.  (Tr. at 257.)

Plaintiff underwent an evaluation at the Minneapolis Pain Clinic in September 1982.  (Tr. at 22.)

Robert B. Cleft, Ph.D., opined that Plaintiff's condition had been medically stable for two years and that

Plaintiff had not taken any initiative to seek further vocational counseling following his second surgery in

1979.  Dr. Clift stated, "Although he sees himself as completely disabled from productive activity, I feel

13

that this is a product of his disabled attitude and that he is probably more capable than he is currently willing or able to let us know." (Tr. at 23.)  In October 1982, Dr.  Clift noted that his biggest fear was that Plaintiff had been disabled for so long that he had accepted the life of disability and no longer had the energy to work out of it.  (Tr. at 23.)

Also in October 1982, Plaintiff was hospitalized for conservative treatment of his back injury and discharged on a program of physical therapy. (Tr. at 21.)

In February 1983, Plaintiff underwent a comprehensive neurological examination with Dr. David Johnson.  Physical examination found back bending moderately restricted, resulting in low back discomfort. Straight leg raising also resulted in low back pain.  Although there was moderate spasm in the lumbosacral area, there was no particular tenderness.  Plaintiff walked and stood normally on his heels and toes and his coordination was normal. (Tr. at 21.)  Romberg testing was negative and gait and heel to toe walking were normal.  Examination of the dorsal spine revealed no spasm or tenderness and examination of the lumbosacral spine found that Plaintiff moved normally about the room without any evidence of pain.  He had a well-healed, non-tender laminectomy scar and a normal lordotic curve.  Dr. Johnson recommended that Plaintiff lose weight, become more active and enter a training program in order to be physically rehabilitated.  He noted that Plaintiff had been off work for five and a half years and his muscles were in poor tone.  (Tr. at 22.)

Plaintiff underwent exploratory surgery at the L4-5, L5-SI areas on the left side on April 25, 1983. Nothing other than scar tissue was encountered.  Dr. Gislason noted some improvement postoperatively. According to Dr. Gislason, by August 1984, Plaintiff's condition had more or less stabilized, and Plaintiff reported that he was able to get along fairly well the way he was.  (Tr. at 22.)

ALJ Tierney further reviewed additional medical records subsequent to the date for which Plaintiff

was last insured for disability insurance benefits.  (Tr. at 22.)  Plaintiff continued to receive treatment for

back pain during the later 1980's and 1990's.  The record also documents headache pain, beginning in

1987. Treatment notes from 1990 indicated that Plaintiff's back pain had decreased to the point where he

was taking only occasional Tylenol #3 for his back pain.  (Tr. at 22.)  In April 1999, Dr. Jagiella, one of

Plaintiff's treating physicians, opined that Plaintiff's problems were somatization and inactivity and noted

that Plaintiff had an apparent low pain threshold.  (Tr. at 22.)

## II.     PROCESS OF REVIEW

"The Social Security program provides benefits to people who are aged, blind, or who suffer from

a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); see also 42 U.S.C.

§ 1382(a).  A person is disabled if his or her physical or mental condition renders that person unable to do

not only his or her previous work, but also any other kind of substantial gainful employment that exists in

the national economy.  42 U.S.C. § 1382c(a)(3)(B).  The impairment must last for a continuous period of

not less than twelve months or be expected to result in death.  42 U.S.C. §1382c(a)(3)(A); see also 20

C.F.R. §§ 404.1509, 416.909.

### A.     Administrative Law Judge Hearing

If the initial application for disability benefits is denied, a claimant may request a *de novo*

reconsideration.  20 C.F.R. §§ 404.909, 416.1409.  Any claimant dissatisfied with the reconsideration may

request a hearing before an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A); 20 C.F.R. §§ 404.929,

416.1429, 422.203.

The ALJ must follow a five-step analysis in determining whether a claimant is disabled:

    1.     Has the claimant engaged in substantial gainful activity since the alleged onset
           disability?
    2.     Is the claimant suffering from a medically severe impairment or combination of

impairments?

3.      Does the claimant's impairment(s) meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1?

4.      Does the claimant have the residual functional capacity (RFC) to perform the claimant's past relevant work?

5.      Is there any other work in the national economy that the claimant can perform?

20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); see also Bowen v. Yuckert, 482 U.S. 137, 140-141 (1987).  Once the claimant demonstrates her impairments prevent her from performing her previous work, the burden shifts to the Commissioner to prove that jobs exist in the national economy that the claimant could perform.  O'Leary v. Schweiker, 710 F.2d 1334, 1337 (8th Cir. 1983).

**B.      Appeals Council Review**

If dissatisfied with the ALJ's decision, a claimant may request review by the Appeals Council, which may choose to hear or deny that request.  20 C.F.R. §§ 404.967, 416.1467.  The decision of the Appeals Council (or the ALJ if the Appeals Council denies the review request) is the final decision of the Commissioner, and is binding upon the claimant unless appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383©)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.      Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989); see 42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of the Dep't. of HEW, 623 F.2d 523, 527 (8th Cir. 1980).

Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Brand, 623 F.2d at 527 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.  The credibility findings made by the ALJ,

2.  The Plaintiff's vocational factors,

3.  The medical evidence from treating and consulting physicians,

4.  The Plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments,

5.  Any corroboration by third parties of the Plaintiff's impairments, and

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion,  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.    THE FINDINGS AND OPINION OF THE ADMINISTRATIVE LAW JUDGE

As a threshold matter, ALJ Tierney noted that Plaintiff met the insured status requirements for entitlement to benefits on October 11, 1977, the date he asserts he became unable to work, and continued

to meet these requirements through December 31, 1981, the date he last met the insured status requirements of the Act.   At the first step of his analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity at any time since the date of disability.  (Tr. at 15.)                At the second step, the ALJ analyzed whether Plaintiff is subject to any "severe" physical or mental impairment.  Having reviewed Plaintiff's medical records, ALJ Tierney concluded that Plaintiff's lumbar disc syndrome and status, post four laminectomies, was a "severe" impairment, since it has resulted in significant limitations on Plaintiff's ability to perform basic work activities.  (Tr. at 16.)   He did not, however, find that references in Plaintiff's medical records to depression rose to a medically determinable medical impairment prior to December 31, 1981.  At the third step, the ALJ found Plaintiff was not subject to any impairment, or combination of impairments, that met or equaled the requirements of the Listing of Impairments.  (Tr. 16.)

Next, the ALJ determined Plaintiff's Residual Functional Capacity (RFC).  (Tr. at 17.)  In doing so, the ALJ evaluated Plaintiff's subjective complaints according to the provisions of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p.   (Tr. 17.)  The ALJ must also consider any medical opinions from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations.  (20 C.F.R. § 404.527 and Social Security Rulings 96-p and 96-6p.)

For the period of time in question, ALJ Tierney noted that Plaintiff alleged disability due to chronic low back pain radiating into both legs, neck and shoulder pain, headaches and periods of depression.  (Tr. at 17; 113-118.)  Plaintiff reported an inability to perform any physical activity for any sustained period of time, because he needs to constantly change positions and cannot stand, sit or walk for any sustained period.  Id.  ALJ Tierney also considered Plaintiff's hearing testimony.  (Tr. at 17.)

The ALJ concluded that for the time period in question, Plaintiff retained the residual functional

capacity ("RFC") to lift a maximum of twenty pounds occasionally and ten pounds frequently. (Tr. at 17.) Plaintiff would be allowed a sit/stand option as needed and would be limited to only occasionally twisting, bending and stooping.  (Tr. at 17.)  ALJ Tierney concluded that Plaintiff was not incapable of all work activity at any exertional level because of significant inconsistencies in the record as a whole.  (Tr. at 18.)

Specifically, ALJ Tierney emphasized the opinions of Lawrence Farber, M.D., and David Johnson, M.D., P.A., who conducted neurological evaluations of Plaintiff in February 1982 and 1983, respectively.  Dr. Farber found Plaintiff capable of performing work at the light exertional level with the opportunity to change positions as needed.  Dr. Johnson opined that Plaintiff was not temporarily totally disabled and that he was capable of work activity involving lifting a maximum of twenty-five pounds with no repetitive bending, lifting and twisting activities.  (Tr. at 18; 184-86; 188-92.)  ALJ Tierney also considered the opinions of Plaintiff's treating physician, Dr. Gislason,  but discounted them because he found them to be inconsistent with other objective medical evidence, including the opinions of Drs. Farber and Johnson, and with Dr. Gislason's own statements regarding Plaintiff's functional limitations. (Tr. at 18.) In particular, he noted that while Dr. Gislason determined that Plaintiff should not return to his past relevant work, Dr. Gislason indicated on other occasions that Plaintiff should be rehabilitated in order to obtain other employment.  (Tr. at 18; 256, 283, 284, 285.)  Moreover, the ALJ gave weight to Dr. Gislason's August 10, 1982 statement that he agreed with the findings of Dr. Farber.  (Tr. at 18; 256.)

While the ALJ determined that Plaintiff could not perform his past work, which included jobs as a paver operator, tank repairer, electrical assembler and construction laborer,  VE Harren testified that an individual retaining the RFC determined by the ALJ could perform other work existing in the national economy.  (Tr. at 24.)  The ALJ noted that even though VE Harren's underlying data was based upon a

time period from 1986-1988, he found her overall testimony credible and consistent with the evidence in

the record.  (Tr. at 24-25.)  Based upon the entire record, the ALJ determined that Plaintiff did not meet

the criteria for a finding of disability at any relevant time.  (Tr. at 25.)

## IV.    DISCUSSION

### A.    Listing 1.04A, Disorders of the Spine

Plaintiff argues that the record establishes that he met and/or equaled the requirements of Listing

1.04A, disorders of the spine, of the Listing of Impairments, 20 C.F.R. 404, subpart P, Appendix 1, due

to his back and leg injury.  (Pl.'s Mem. Supp. Mot. Summ. J. at 11-12.)  Plaintiff cites to medical records

which he contends evidence nerve root compression characterized by neuro-anatomic distribution of pain

with limitation of motion of the spine and motor loss which is accompanied by sensory/reflex loss and

positive straight-leg raising.  (Pl.'s Mem. Supp. Mot. Summ. J. at 11-12.)

If a claimant's impairment meets the medical criteria of an impairment listed in 20 C.F.R. § 404,

Subpart P, Appendix 1, the claimant will be found disabled.  20 C.F.R. § 404.1525(d); Zebley v. Sullivan,

493 U.S. 521, 529 (1990).  A claimant's impairment must match all of the specified medical criteria in

order to show the impairment meets a listing, 20 C.F.R. § 404.1525(c), and the claimant bears the burden

of establishing every element of the specified criteria.  Bowen v. Yuckert, 482 U.S. 137, 146, n. 5 (1987).


The record supports ALJ Tierney's conclusion that Plaintiff failed to meet Listing 1.04A.  As the

ALJ noted, the records following Plaintiff's December 1977 surgery reveal mildly positive straight leg

raising on the left, but no other abnormalities.  (Tr. at 16.)  In March 1978, May 1978 and February 1979,

physical examinations conducted were unremarkable and essentially negative.  (Tr. at 282-84.)  Plaintiff

had some leg cramping and discomfort in April 1979, but following an eleven-day hospitalization and

treatment, a July 1979 electromyogram was normal. (Tr. at 276-80.)          Plaintiff also cannot

establish that his musculoskeletal condition met every element of the specified criteria under Listing 1.04A.

The listing provides that a claimant must be able to demonstrate a disorder of the spine resulting in a

compromise of a nerve root or the spinal cord, with evidence of nerve root compression, which is

characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, and motor loss

(atrophy with associated muscle weakness or just muscle weakness) accompanied by sensory or reflex

loss, and if there is involvement of the lower back, the medical evidence should reflect a positive straight-leg

raising test. (See Listing 1.04A.)          While Plaintiff references clinical findings within the relevant time

period (Pl.'s Mem. in Supp. Mot. Summ. J. at 11-12), treatment during the relevant time period reveals

no documentation or evidence of muscle atrophy.  Plaintiff's motor strength in the lower extremities was

normal.  (Tr. at 281-83.)  Even in the period outside the expiration of Plaintiff's insured status, the record

reveals similar findings.  (Tr. at 185-86; 190.)  Accordingly, the Court finds that the ALJ's finding that

Plaintiff did not met or equal the requirements of Listing 1.04A is supported by substantial evidence in the

record.

**B.      The Evaluation of the Opinions of Plaintiff's Physicians**

A treating physician's opinion is accorded controlling weight where it is well supported by medically

acceptable techniques, and is not inconsistent with other substantial evidence in the record.  20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).  Nonetheless, whether a claimant is disabled is a determination reserved

for the Commissioner, and a statement by a medical source regarding disability is not dispositive.  20

C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  Opinions regarding disability are not entitled to the same

weight as other medical opinions.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).  "While we recognize

that the treating physician is entitled to particular deference, his statements as to the ultimate issue of

disability are not controlling." Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).   Further, if a non-treating physician's opinion is consistent with the record as a whole and supported by better, or more thorough evidence, it may be entitled to greater weight than the opinion of a treating source.   Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

As noted above, ALJ Tierney emphasized the opinions of Lawrence Farber, M.D., and David Johnson, M.D., P.A., who conducted neurological evaluations of Plaintiff in February 1982 and 1983, respectively.   Both doctors found Plaintiff capable of performing work at the light exertional level, although they saw Plaintiff after December 31, 1981, the date of his last insured status.   (Tr. at 18; 184-86; 188-92.)   While ALJ Tierney also considered the opinions of Plaintiff's treating physician, Dr. Gislason, he discounted them because he found them inconsistent with the opinions of Drs. Farber and Johnson, and with Dr. Gislason's own statements regarding Plaintiff's functional limitations.   (Tr. at 18.)   In particular, he noted that while Dr. Gislason determined that Plaintiff should not return to his past relevant work, Dr. Gislason indicated on other occasions that Plaintiff should be rehabilitated in order to obtain other employment.   (Tr. at 18; 256, 283, 284, 285) (emphasis added).   In addition, the ALJ gave weight to Dr. Gislason's August 10, 1982 statement that he agreed with the findings of Dr. Farber.   (Tr. at 18; 256.)

As indicated in 20 C.F.R. § 404.1527(e), Dr. Gislason's notation that Plaintiff was "disabled," is an issue reserved for the Commissioner, and is not entitled to deference.   Further, as the ALJ noted, Dr. Gislason's classification of Plaintiff as disabled was inconsistent with his remarks elsewhere in the record that Plaintiff should be rehabilitated.   Also, Dr. Gislason agreed with Dr. Farber that Plaintiff was capable of performing light work, if not required to sustain one position for long periods of time.   (Tr. at 256.)   To the extent that Dr. Gislason agreed with Dr. Farber's conclusions, Dr. Farber's opinion was not inconsistent with other evidence in the record.   (Tr. at 186, 256.)   Dr. Farber's opinion was also consistent

with the opinion of Dr. Johnson.  (Tr. at 192), and both of their opinions were supported by documentation

of physical examination findings.  (Tr. at 184-86, 187-92.)  Thus, because the opinions of Drs. Farber and

Johnson were well-supported and consistent with the overall record, the ALJ reasonably accorded them

greater weight than Dr. Gislason's opinions regarding disability.

ALJ Tierney correctly noted that Plaintiff's physical impairments such as headaches cannot

be used as a basis for establishing disability which began on or before December 31, 1981.

### C.      The Administrative Law Judge's Credibility Determinations

Pain can cause a disability within the meaning of the Social Security Act.  Northcutt v. Califano,

581 F.2d 164, 166 (8th Cir. 1978).  Because evidence of pain is necessarily subjective in nature, it is

difficult to evaluate.  Id.  Evaluation of subjective testimony is based partly on the credibility of the claimant.

Johnson v. Sec'y of HHS, 872 F.2d 810, 812 (8th Cir. 1989).  Therefore, "the ALJ, as fact finder, must

make the initial determination."  Id.   The credibility of a claimant's subjective testimony is primarily for the

ALJ to decide, not the courts.  Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001).

In evaluating subjective complaints,

> The adjudicator must give full consideration to all of the evidence
> presented relating to subjective complaints, including the claimant's prior
> work record, and observations by third parties and treating and examining
> physicians relating to such matters as:
>     1. the claimant's daily activities;
>     2. the duration, frequency and intensity of the pain;
>     3. precipitating and aggravating factors;
>     4. dosage, effectiveness and side effects of medication;
>     5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective complaints
> *solely* on the basis of personal observations.   Subjective complaints may be
> discounted if there are inconsistencies in the evidence as a whole.

Polaski, 739 F.2d at 1322 (emphasis in original).

Direct medical evidence of the relationship between the claimant's physical impairments and

subjective pain is not necessary, and claimant's subjective complaints cannot be disregarded solely because no objective evidence supports those complaints. Northcutt, 581 F.2d at 166. "An ALJ who rejects a claimant's complaints, however, must make an express credibility determination explaining his reasons for discrediting the complaints." Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991). Credibility determinations must be supported by substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).

In reaching his opinion as to Plaintiff's RFC, ALJ Tierney stated that he found Plaintiff credible as to his account of pain and functional limitation he suffered during the pertinent period in this case. Accordingly, ALJ Tierney reduced the RFC to accommodate those limitations. (Tr. at 17.)  However, ALJ Tierney also indicated that inconsistencies in the record did not enhance Plaintiff's credibility.  (Tr. at 22.) For example, he stated that although Plaintiff had been urged to become more physically active and lose weight, treatment notes from February 2002 indicated that Plaintiff weighed 235 pounds – approximately 15 pounds more than he weighed in February 1982.  The Court, however, notes that this weight gain falls well outside the relevant time period.  ALJ Tierney also noted references in the medical record to Plaintiff's non-compliance while attending the pain clinic and his failure to complete the outpatient program.  ALJ Tierney found that these references reduced the credibility of Plaintiff's allegations that he is disabled.  (Tr. at 22.)   Further, ALJ Tierney speculated that Plaintiff's receipt of $625 per week in Workers Compensation benefits might have resulted in a lack of motivation to return to full-time employment.

Based on what may be merely a typographical error in the ALJ's report, the Court is nonetheless concerned about the ALJ's conclusion that the Plaintiff's course of medical treatment was inconsistent with disabling levels of pain.  Specifically, ALJ Tierney states:

The record reveals intermittent medical treatment during the relevant time period in this case, with no treatment whatsoever from <u>May 1978 to January 1999</u> and from <u>September 1999 to March 1980</u>. The undersigned finds the claimant's apparent ability to get along without any medical care during the above time periods inconsistent with his assertions of total disability.

(Tr. at 23) (emphasis added.)   The ALJ's referenced time periods make no sense, even without reference to the medical record. The Court therefore questions the ALJ's conclusions in evaluating Plaintiff's subjective complaints, particularly as they relate to subjective complaints about the duration, frequency and intensity of pain, as the Court is uncertain about the source of the ALJ's opinion, or the time periods to which he refers. To the extent that Plaintiff's subjective complaints comprise part of the ALJ's calculation of Plaintiff's RFC, the Court believes that rehearing is necessary.

### D.      The Vocational Expert's Underlying Data

A hypothetical question posed to the vocational expert is sufficient if it includes all those impairments supported by substantial evidence in the record. <u>Taylor v. Chater</u>, 118 F.3d 1274, 1278-79 (8th Cir. 1997). Checklists such as the RFC assessment are entitled to little weight in the evaluation of a disability and do not constitute substantial evidence. <u>Gilliam v. Califano</u>, 620 F.2d 691, 693 (8th Cir. 1980).

Plaintiff argues that the VE Harren's testimony had no basis in relevant foundational facts because she did not rely upon job data during the 1977-1981 time period in question. Therefore, Plaintiff argues that the Commissioner failed to meet her step five burden of establishing the existence of significant numbers of other jobs that Plaintiff could perform. (Pl.'s Reply Mem. Supp. Mot. Summ. J. at 8.)

Defendant argues that VE Harren suggested that no significant change in the number of available jobs occurred during the five-year period after Plaintiff's insurance status expired in 1981 through 1986 (Def.'s Mem. Supp. Mot. Summ. J. at 19, Tr. at 24-25; 63.) In addition, Defendant contends that because

Plaintiff has produced no evidence to rebut the VE's testimony, her testimony remains valid. ((Def.'s Mem. Supp. Mot. Summ. J. at 19, citing Harris v. Barnhart, 356 F.3d 926, 931, n. 2 (8th Cir. 2004)).

In Harris, the claimant argued that the hypothetical presented to the VE did not accurately reflect the claimant's limitations on her ability to work. 356 F.3d at 931. Before concluding that the hypothetical accurately reflected the Plaintiff's RFC, the Eighth Circuit simply commented in a footnote that its precedent was inconsistent on where the burden of persuasion lies during the step five analysis.

Here, the Court finds first, that because of its concerns with the RFC described above, that the hypothetical presented to VE Harren may have been flawed at the outset. In addition, VE Harren lacked any evidence of jobs available during the time period in question. The ALJ found VE Harren's lack of documentation not fatal and he also characterized her testimony as stating that the data between 1981 and 1986 would not have changed significantly. (Tr. at 25.) VE Harren testified:

> And I have statistics going back to the '80's regarding all these jobs. And I have compared the numbers that exist now compared to the jobs that existed in the '90's and the jobs that existed in the '80's and what I have come up with other than a few select jobs, the numbers have not changed significantly. So I'm testifying that these are the numbers that exist currently but also, on my review of the record that go back to 1980 from the Department of Economic Security, they're not substantially different.

VE Harren's underlying data does not cover the time period in question. The fact that data from the 1980's and 1990's did not change significantly, or data from 1981 as compared to 1986 did not change significantly, does not address the data applicable for the years 1977-1981. Because the Court finds that the hypothetical question was flawed and that the VE's testimony lacked proper foundational support, the Court concludes that the Commissioner failed to meet her step five burden of establishing the existence of significant numbers of other jobs that Plaintiff could perform. Therefore, the Court recommends that the Commissioner's decision be reversed and remanded for further administrative proceedings.

**IT IS HEREBY RECOMMENDED that:**

1.    Plaintiff's Motion for Summary Judgment (Do. No. 32) be **DENIED** as to outright reversal and award of benefits, but **GRANTED** as to the alternative request that the Commissioner's decision be **REVERSED** and the case **REMANDED** for further administrative proceedings consistent with this Report and Recommendation; and

2.    Defendant's Motion for Summary Judgment (Doc. No. 41) be **DENIED**.

Dated:  July 7, 2005

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by July 22, 2005, after being served with a copy thereof.  The party shall file with the Clerk of Court, and  serve on all parties, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.